**Ernest STICH and Miriam Stich,
Plaintiffs,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. A. No. 78–746.**

United States District Court,
D. New Jersey.

Feb. 8, 1983.

Drazin & Warshaw by Louis M. Drazin, and Dennis A. Drazin, Red Bank, N.J., for plaintiffs.

W. Hunt Dumont, U.S. Atty. by Jerome B. Simandle, Louis J. Bizzarri, Asst. U.S. Attys., Trenton, N.J., for defendant.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This is an action brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, and the Swine Flu Act, 42 U.S.C. § 247b. Plaintiffs, Mrs. Miriam and Dr. Ernest Stich, seek to recover damages allegedly suffered as a result of a swine flu inoculation which Mrs. Stich received on November 18, 1976, pursuant to the national immunization program undertaken by the federal government. *See* The National Swine Flu Immunization Program of 1976, Pub.L. 94–380, 90 Stat. 1113. Specifically, Mrs. Stich contends that she contracted either Guillain-Barre Syndrome ("GBS") or some other condition as a result of this immunization which, in turn, caused her to suffer her injuries. Her husband, Dr. Stich, seeks recovery for loss of consortium and loss of services.

Under the Federal Tort Claims Act, as incorporated in the Swine Flu Immunization Act, this action is governed by the law of the forum state, here New Jersey, except as otherwise provided. 28 U.S.C. § 1346(b); 42 U.S.C. § 247b(k)(2)(A); *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

## PROCEDURAL HISTORY

This action was filed on April 12, 1978. On May 18, 1978, it was transferred by the Judicial Panel on Multidistrict Litigation to the United States District Court for the District of Columbia for coordinated and consolidated pretrial proceedings pursuant

to 28 U.S.C. § 1407 before the Honorable Gerhard A. Gesell. The case was thereafter remanded to this court on February 5, 1980. The Final Pretrial Order of the transferee court, dated November 15, 1979, provides that if plaintiffs establish that Mrs. Stich contracted GBS, they need not establish any theory of liability. If, however, it cannot be established that she has GBS, then plaintiffs must prove negligence or another appropriate theory of liability.

The Final Pretrial Order also limits the litigants herein to local discovery, meaning only that which is specifically related to her condition. Over seventy depositions were taken during the course of national discovery, many of which were introduced into evidence at trial in this action.

The trial of this nonjury case was trifurcated. The three phases contemplated in the pretrial order are: Phase I—Diagnosis and Causation of Miriam Stich's condition; Phase II—Foreseeability of Risk and Informed Consent; Phase III—Damages. After thirty-nine days of testimony comprising some 6,390 pages of trial transcript, the trial of Phase I has been completed. The plaintiffs have presented medical testimony through the following witnesses:

Dr. Joseph Gluck, internist and a treating physician of Mrs. Stich

Dr. Howard Medinets, neurosurgeon and specialist in forensic medicine

Dr. Robert Lisak, neurologist

Dr. Charles Poser

Plaintiffs also presented testimony by deposition of certain doctors drawn from the multi-district discovery proceedings in the consolidated swine flu cases. See In re Swine Flu Immunization Products Liability Litigation, 89 F.R.D. 695 (D.C.D.C.).

The United States presented medical evidence through the following witnesses:

Dr. Peter Tsairis, neurologist and electromyographer

Dr. Richard Price, neurologist and virologist

Dr. Richard Whitley, virologist and Director of the National Institute of Allergy and Infectious Diseases ("NIAID") Collaborative Anti-Viral Study Group

Dr. Neal Nathanson, epidemiologist and microbiologist

Defendants also presented testimony through the multi-district depositions, including the following witnesses:

Dr. Barry Arnason, Dr. Paul Wehrle, Dr. Stephen Schoenbaum, Dr. Peter Dyck, Dr. Larry Schonberger, Dr. Henry Retailliau, Dr. Alexander Langmuir, Dr. Jonas Salk, Dr. Frederick Davenport, Dr. Harry Meyer, Dr. David Karzon, Dr. Gordon Meiklejohn, Dr. D.A. Henderson, Dr. David Sencer, Dr. Charles Hoke, Dr. J. Donald Millar, Dr. John Seal, and Dr. E. Russell Alexander.

The court has carefully considered the live testimony, the deposition testimony, the exhibits submitted, and the arguments of counsel. This memorandum constitutes the court's decision and includes the court's findings of fact and conclusions of law pursuant to Federal Rules of Civil Procedure 52(a). I find that Mrs. Stich has failed to establish by a preponderance of the credible evidence that the condition she is suffering from is GBS, or that it is causally related to the swine flu inoculation which she received. I find instead that the most probable diagnosis of Mrs. Stich's condition is herpes simplex encephalitis ("HSE") of a viral etiology unrelated to the swine flu inoculation she received. See Caputo v. United States, 157 F.Supp. 568, 571 (D.N.J. 1957); Szczytko v. Public Service Coordinated Transport, 21 N.J.Super. 258, 264, 91 A.2d 116 (App.Div.1952).

## MRS. STICH'S MEDICAL HISTORY

It is undisputed that Mrs. Stich received a swine flu inoculation at Brookdale Community College on November 18, 1976.[1] That afternoon she flew to California on a pleasure trip, where she stayed for five days. On November 22, 1976, towards the end of

---

1. Mrs. Stich received only one other inoculation in the one year period prior to her swine flu inoculation on this date, a flu vaccine type B, on October 25, 1976.

her stay in California, she began to feel ill. She returned home to New Jersey the next day. At that time she had a fever, muscle aches, a headache and noted a general malaise. Her physician husband put her to bed and gave her Keflex and aspirin. The following day, November 24, 1976, she remained ill with a fever of 102 degrees and was in bed, and on November 25, 1976, she was not well enough to prepare the Thanksgiving dinner.

On November 26, 1976, Mrs. Stich was seen at her home by the family's physician, Dr. Joseph Gluck. Although she still had a fever and complained of a headache and a general loss of well-being, her physical examination at that time was otherwise unremarkable. Her urinalysis and complete blood count were normal, and Dr. Gluck prescribed rest and aspirin.

On November 27, 1976, Mrs. Stich was taken to the Emergency Room of Riverview Hospital in Red Bank, New Jersey, where she was admitted at 12:00 p.m. Upon examining Mrs. Stich, Dr. Gluck found her condition dramatically changed. He noted that she now had convulsions as well as a fever. She was totally unconscious, and the muscles of all her extremities were in spasm. Her neck was supple, her eyes were roving horizontally without focusing, although they were deviating mainly to the left. Her pupils were equal, small and reacted normally to light. The Babinski and Hoffman reflexes, which are indicative of central nervous system ("CNS") pathology, were both abnormal. Mrs. Stich appeared to have normal power in her extremities and she was continent. During her convulsive state, Dr. Gluck noted that Mrs. Stich showed physical signs of decerbration. The family history, which was taken on November 27, 1976 and dictated by Dr. Gluck, indicates the following:

> Examination in the past has been without any significant abnormalities other than residual polio affecting both lower extremities, mainly to the left; approximately five days ago, while in California, she noted the onset of malaise, muscle aches, headache and then fever. She flew home and by the next day, had temperature to 102 degrees with marked loss of well-being. There were no other specific symptoms. The illness had the character of a typical acute febrile viral infection.

Diagnosis on admission by Dr. Gluck was meningo-encephalitis of unknown etiology. Dr. Gluck was unaware until December 10, 1976, that Mrs. Stich had received a swine flu inoculation on November 18, 1976. Dr. Gluck had, however, himself given her an influenza B inoculation on October 25, 1976.

For the three or four days following her admission to Riverview Hospital, Mrs. Stich's level of consciousness varied substantially, although she never regained full normality. By December 2, 1976, she was totally unconscious and unresponsive, and she remained comatose or semi-comatose for the next three to four months.

On February 14, 1976, Mrs. Stich was transferred to the Neurological Institute at Columbia Presbyterian Hospital in New York, New York. This transfer was apparently made for the purpose of seeking assistance with the diagnosis treatment of Mrs. Stich's condition, and perhaps to facilitate the performance of a brain biopsy. The medical records from her stay at Columbia Presbyterian Hospital indicate that during this period her vital signs were stable and normal. Although she did not respond to external stimuli, she did occasionally open her eyes and look around her room. No verbalization took place.

On March 8, 1977, she was again re-hospitalized at Riverview Hospital. By April or May her coma had lightened to the point that she was awake. On June 6, 1978, she was transferred to Morris Hall Rehabilitation Center and remained there until August 15, 1978, when she was again returned to Riverview Hospital. Mrs. Stich currently remains at Riverview.

As a result of intensive therapy, Mrs. Stich eventually became able to walk with substantial assistance, sometimes feed herself and perform certain other activities of daily living. She remains seriously disoriented, however, and much of her speech is

unintelligible. A physical examination by Dr. Tsairis on October 14, 1981, found her spastic in all four extremities. She still exhibited bilateral Babinski reflexes, and could not follow objects or fingers with her eyes. She had a mild left ptosis (drooping of the eyelid) and would attempt to put into her mouth any object that would come into her visual field. As is clear from this summary, Mrs. Stich's residual intellectual impairment is substantial.

## GUILLIAN–BARRE SYNDROME—GBS

Guillian-Barre Syndrome is a neurologic disorder, inflammatory in nature, which was first described in 1859 by Dr. Landry. It was again described in 1916 by Drs. Guillian, Barre and Stohl. The syndrome characterizes a set of neurologic symptoms, rather than defining a specific organic disorder. To date, medical science has not established the syndrome's exact etiology or cause.

The extent to which GBS may encompass any CNS involvement remains a controversy within the medical community. As classically defined, GBS is a peripheral neuropathy which results from the demyelination of the peripheral nervous system.[2] This demyelination results in a progressive motor weakness of the limbs which ranges from mild weakness to paralysis of every motor muscle. Most typically GBS involves the lower extremities initially, progressing (normally over the course of between a few days and two weeks) upward to affect the upper limbs, face and bulbar muscles. This progressive weakness affects both proximal and distal muscles, and it reaches a plateau in the second or third week after onset as the affected muscles begin to re-myelinate. Over the course of a period ranging from three months to one year, GBS patients generally regain full use of the affected

muscles, although there are permanent residual effects in approximately 10% of all GBS cases.

Plaintiffs urge this court to adopt a much broader clinical definition of GBS. Their position is that GBS may embrace a wider spectrum of neurologic or CNS involvement than suggested by the classical definition, and that GBS does not represent any specific neurologic picture. They argue that GBS properly includes central nervous system disease as well as peripheral nervous system disease, and may affect any or all, or any combination of the parts, of the nervous system.

## THE "NINCDS" CRITERIA

▄ While the precise nature of the syndrome may be in dispute, the criteria established for the diagnosis of GBS by the National Institute of Neurological and Communicative Diseases and Stroke ("NINCDS") have been generally accepted by the medical profession, and particularly by neurologists, as an authoritative and accurate description of GBS.[3] *See* 3 Annals of Neurology, (June 1978). Under these criteria, clinical, laboratory and electrodiagnostic data are together evaluated in a nonmechanistic manner to determine whether a diagnosis of GBS is appropriate in a specific case. I find the NINCDS criteria to be an appropriate standard against which to measure the plaintiffs' proofs and adopt them as controlling herein.

Under the NINCDS criteria, the two features required for diagnosis are:

A. Progressive motor weakness of more than one limb. The degree ranges from minimal weakness of the legs, with or without mild ataxia, to total paralysis of the muscles of all four

2. The peripheral nervous system includes the nerves which extend away from the brain, the brain stem, and the spinal cord. The central nervous system consists of the brain, brain stem and the spinal cord.

3. The committee which proposed the NINCDS Criteria was composed of four of the nation's leading neurologists and experts on GBS. The

committee consisted of Dr. Arthur Asbury, M.D., Chairman of Neurology at University of Pennsylvania (Committee Chairman), Dr. Herb Karp, M.D., Chairman of Neurology at Emory University, Dr. Dale McFarlin, M.D., Director of Neurologic Research at the National Institute of Health, and Dr. Barry Arnason, M.D., University of Chicago.

extremities and the trunk, bulbar and facial paralysis, and external ophthalmoplegia.

B. Areflexia (loss of tendon jerks). Universal areflexia is the rule, though distal areflexia with definite hyporeflexia of the biceps and knee jerks will suffice if other features are consistent.

I have previously discussed the characteristic monophasic course of progressive motor weakness, plateau, and then gradual improvement that is a diagnostic hallmark of GBS. Areflexia, the second required finding in GBS, is the absence or depression of deep tendon reflexes ("DTRs"). The type of reflex loss finding required to substantiate a diagnosis of GBS is a value less than one-plus or two-plus, which are considered to be in the normal range. This loss of DTRs must occur within days or, at most, a few weeks of the onset of the illness.

It follows as a corollary to this required absence or depression of DTRs that the related pathological reflexes or signs, such as the Babinski and Hoffman, would be similarly absent. The presence of either these pathological reflexes or of increased DTRs (hyperreflexia) would be an indication of central nervous system disease. Other signs of an overwhelming central nervous system involvement, such as a history of mental confusion, dementia, loss of memory and cognitive functions, delirium and agitation, would suggest a diagnosis other than GBS.

The NINCDS criteria next list seven clinical features which are strongly supportive of a diagnosis of GBS. Ranked in order of importance, these are:

1. Progression. Symptoms and signs of motor weakness develop rapidly but cease to progress by four weeks into the illness. Approximately 50% will reach the nadir by two weeks, 80% by three weeks, and more than 90% by four weeks.

2. Relative symmetry. Symmetry is seldom absolute, but usually, if one limb is affected, the opposite is as well.

3. Mild sensory symptoms or signs.

4. Cranial nerve involvement. Facial weakness occurs in approximately 50% and is frequently bilateral. Other cranial nerves may be involved, particularly those innervating the tongue and muscles of deglutition, and sometimes the extraocular motor nerves. On occasion (less than 5%), the neuropathy may begin in the nerves to the extraocular muscles or other cranial nerves.

5. Recovery. It usually begins two to four weeks after progression stops. Recovery may be delayed for months. Most patients recover functionally.

6. Autonomic dysfunction. Tachycardia and other arrhythmias, postural hypotension, hypertension, and vasomotor symptoms, when present, support the diagnosis. These findings may fluctuate. Care must be exercised to exclude other bases for these symptoms, such as pulmonary embolism.

7. Absence of fever at the onset of neuritic symptoms.

The six variants of GBS which have been recognized under the NINCDS criteria are:

1. Fever at onset of neuritic symptoms.

2. Severe sensory loss with pain.

3. Progression beyond four weeks. Occasionally, a patient's disease will continue to progress for many weeks longer than four or the patient will have a minor relapse.

4. Cessation of progression without recovery or with major permanent residual deficit remaining.

5. Sphincter function. Usually the sphincters are not affected, but transient bladder paralysis may occur during the evolution of symptoms.

6. Central nervous system involvement. Ordinarily, Guillian-Barre Syndrome is thought of as a disease of the peripheral nervous system. Evidence of central nervous system involvement is controversial. In occasional patients, such findings as severe ataxia interpretable as cerebellar in origin, dys-

arthria, extensor plantar responses, and ill-defined sensory levels are demonstrable, and these need not exclude the diagnosis if other features are typical.

The NINCDS criteria further list cerebrospinal fluid and electrodiagnostic features which are indicative of a diagnosis of GBS:

Cerebrospinal fluid features strongly supportive of the diagnosis

1. CSF protein. After the first week of symptoms, CSF protein is elevated or has been shown to rise on serial lumbar punctures.

2. CSF cells. Counts of 10 or fewer mononuclear leukocytes/mm[3] in CSF.

Variants

1. No CSF protein rise in the period of one to ten weeks after the onset of symptoms (rare).

2. Counts of 11 to 50 mononuclear leukocytes/mm[3] in CSF.

Electrodiagnostic features strongly supportive of the diagnosis

Approximately 80% will have evidence of nerve conduction slowing or block at some point during the illness. Conduction velocity is usually less than 60% of normal, but the process is patchy and not all nerves are affected. Distal latencies may be increased to as much as three times normal. Use of F-wave responses often gives good indication of slowing over proximal portions of nerve trunks and roots. Up to 20% of patients will have normal conduction studies. Conduction studies may not become abnormal until several weeks into the illness.

Finally, the NINCDS criteria list six features whose presence casts doubt on a diagnosis of GBS:

1. Marked, persistent asymmetry of weakness.

2. Persistent bladder or bowel dysfunction.

4. The NINCDS criteria also list six features that rule out the diagnosis of GBS; these are,

3. Bladder or bowel dysfunction at onset.

4. More than 50 mononuclear leukocytes/mm[3] in CSF.

5. Presence of polymorphonuclear leukocytes in CSF.

6. Sharp sensory level.[4]

APPLICATION OF THE "NINCDS" CRITERIA

Applying the NINCDS criteria to the evidence adduced during the first phase of trial, I find that plaintiffs have produced little or no affirmative evidence to support their contention that the proper diagnosis of Mrs. Stich's condition is GBS. In the paragraphs that follow, I will summarize the evidence applicable to each element of the NINCDS criteria, and will assess whether or not it supports plaintiffs' proposed GBS diagnosis.

I. Features Required for Diagnosis

A. "Progressive motor weakness of more than one limb."

At the time of her admission to the Riverview Hospital's Emergency Room on November 27, 1976, four days after the onset of her initial symptoms, Dr. Gluck made several findings relevant to this first criterion. Dr. Gluck's notes of his examination of Mrs. Stich reveal that he found her totally unconscious and convulsing, with muscles of all extremities in spasm, and with clonic convulsions. She had bilateral ankle clonus and normal power in all extremities. A progress note by Dr. Gluck made on November 28, 1976, indicated that Mrs. Stich still had ankle clonus bilaterally and normal power in all extremities.

Further observations were made in the course of a consultation by Dr. Angelo Scotti on November 30, 1976. Dr. Scotti, finding Mrs. Stich more responsive than she had been (in her prior comatose state), recorded that she had good power in all extremities. This observation was confirmed by Dr.

however, inapplicable to Mrs. Stich's condition.

Gluck in a progress note of this same date. A further progress note by Dr. Gluck recorded on December 2, 1976, indicated that Mrs. Stich still had moderate muscle spasticity in all extremities but worse on the left, and that her ankle clonus continued. A consultation performed by Drs. Kreider and Gainsburg on December 3, 1976, found, *inter alia* that Mrs. Stich's spasticity in her lower extremities continued. Another progress note by Dr. Gluck on February 10, 1977, indicated that Mrs. Stich's right hand and foot were clenched, and that she had a tremor in her left hand, and that her neck and extremities were rigid. Finally, Dr. Gluck testified that for the period of December 1, 1976, through January 27, 1977, Mrs. Stich's comatose and semi-comatose state precluded any testing which could conclusively determine her motor strength or the progressivity *vel non* of any motor weakness.[5]

I find that this evidence both fails to affirmatively establish Mrs. Stich's progressive motor weakness and is, in fact, incompatible with the requirements of this first criterion. Dr. Gluck's observations of Mrs. Stich's continuing spasticity [6] and ankle clonus, his findings of normal power in all extremities as late as November 30, 1976, together with the rigidity of her limbs and the clenching of her right hand and foot, are particularly contrary indications. Plaintiffs have offered no credible affirmative evidence which contradicts the "inescapable conclusion" that plaintiffs have

failed to establish the presence of this feature.

### B. "Areflexia."

The second criterion under the NINCDS "Features Required for Diagnosis" is Areflexia, or loss of tendon jerks. The evidence relevant to this is as follows: Mrs. Stich was found to have ankle clonus on November 27th, 28th, 29th, 30th and December 2, 1976. She was found to have Babinski reflexes and/or positive Hoffman signs at various times throughout her initial admission at Riverview Hospital, including November 27th, December 2nd and February 10th. Hyperreflexia, or hyperactive DTRs, were found on November 30th, December 2nd and December 3rd. Each of these observations is inconsistent with, or rules out the presence of, areflexia.[7] Plaintiffs have adduced no affirmative credible evidence to contradict the implication of these observations.[8] I must therefore conclude that plaintiffs have failed to meet either of these first two criteria, both of which are characterized by the NINCDS as *required* features for a GBS diagnosis.

While the plaintiffs' failure to meet these two criteria would be perhaps sufficient to rule out a diagnosis of GBS, prudence and the special circumstances of this case [9] dictate that I evaluate each of the other NINCDS criteria to determine whether they suggest a different conclusion.

---

**5.** I cannot conclude to a reasonable certainty from plaintiffs' proofs that any of Mrs. Stich's leg weakness is due to progressive peripheral motor weakness. Her inability to walk most likely stemmed instead from disuse atrophy. In support of this conclusion, evidence was adduced by the United States that a comatose patient suffers noticeable disuse atrophy in approximately six weeks.

**6.** Spasticity is incompatible with GBS, which normally requires a finding of flaccid motor weakness.

**7.** Dr. Gluck acknowledged that Mrs. Stich's DTRs varied so inexplicably as to be inconsistent with the NINCDS criteria.

**8.** I find that the single observation of depressed or absent DTRs (on February 14, 1977, at Columbia Presbyterian Hospital during Mrs.

Stich's physical examination following admission) is unconvincing or aberrant, given the measured DTRs on February 16, 21, 22 and 28, 1977. Causes other than peripheral nervous system involvement may explain these inconsistencies in DTRs; muscle atrophy, prolonged bed rest and the relaxation of the patient may all cause an absence of DTRs in a patient.

**9.** In particular I note first, that the plaintiffs were severely restricted in the proofs that could be presented because of the limited testing which can be performed on a comatose or semicomatose patient such as Mrs. Stich, and second, that GBS was not an early diagnosis by any treating physician and therefore there was little testing performed which was particularly addressed to the NINCDS criteria.

## II. Features Strongly Supportive of the Diagnosis

### A. Clinical Features

The next set of these criteria are those which the NINCDS characterizes as features strongly supportive of a GBS diagnosis. The first of these is progressive motor weakness. The evidence relating to this criterion uniformly fails to establish progression. Mrs. Stich had no symptoms or signs of progressive motor weakness within the ten weeks immediately following her inoculation which are attributable to a cause other than her comatose or semi-comatose state. Her deterioration occurred early and rapidly; during the relevant four-week period her condition must be described as chronic. Once again the conclusion which I reach is that plaintiffs have failed to establish that Mrs. Stich's condition is consistent with progressivity.

The second clinical feature strongly supportive of a GBS diagnosis is relative symmetry. The evidence relating to this criterion is limited due to the absence of any evidence of motor weakness in Mrs. Stich's limbs.[10] Nonetheless, there is some evidence which suggests that symmetry is absent in her case. In particular, the observations by Dr. Pertchik and others that Mrs. Stich had a left gaze preference,[11] that her muscle spasticity was worse on the left than on the right,[12] that she had left-only wrist and ankle clonus, and that at times she had Babinski and Hoffman reflexes only on the left[13] all tend to be incompatible with a finding of symmetry. In the absence of any affirmative evidence, I conclude that this criterion has not been met by plaintiffs.

The next clinical feature strongly supportive of a GBS diagnosis is "mild sensory symptoms or signs". Mrs. Stich's failure to note any sensation of numbness or tingling

or other similar sensations at the onset of her symptoms might be considered to be inconsistent with this particular feature. Other than this, Mrs. Stich's comatose or semi-comatose condition prevented any conclusive determination of her sensory symptoms or signs. Thus, I agree with defendant that this feature neither supports nor casts doubt upon a diagnosis of GBS.

The fourth feature under the NINCDS criteria is cranial nerve involvement. Here the only evidence which arguably supports a finding of the presence of this feature is Dr. Pertchik's observation on November 27, 1976, that Mrs. Stich had a conjugate gaze preference to the left and that her eyes were roving. This observation is by itself inconclusive, however, because such a symptom could be the result of either cranial nerve or central nervous system involvement. Otherwise, the evidence fails to demonstrate any possible cranial nerve involvement: There is facial weakness noted, no tongue or muscles of deglutition involvement, she swallowed normally, and her pupils were equal, small, and reactive.[14] I therefore must conclude that plaintiffs have failed to demonstrate by a preponderance of the credible evidence that Mrs. Stich had any cranial nerve involvement.

The next clinical feature cited by the NINCDS criteria is recovery. Mrs. Stich has, with therapy, been able to regain only minimal functional abilities, but many of her disabilities are seemingly permanent or chronic, including residual spasticity and general weakness. Further, her recovery, contrary to the usual pattern, did not begin two to four weeks after progression stopped. I find on balance that the evidence is insufficient to find that Mrs. Stich has recovered in accordance with the terms of this feature.

---

**10.** The import of this evidence is difficult to assess given Mrs. Stich's history of polio, particularly in her left leg.

**11.** A neurological consultation by Dr. Pertchik on November 22, 1976, found "conjugate gaze preference to left."

**12.** See report of neurological exam by Dr. Pertchik on December 2, 1976.

**13.** See progress note by Dr. Gluck dated February 10, 1977.

**14.** See report of neurological consultation by Dr. Pertchik on November 27, 1976.

The sixth of these NINCDS features is autonomic dysfunction. The signs which would support this feature are entirely absent. No unusual vascular signs were noted, nor were tachycardia or other arrhythmias, postural hypotension, hypertension or vasomotor symptoms. I must therefore conclude that plaintiffs have failed to demonstrate that Mrs. Stich manifested this feature.

The seventh and final clinical feature which under the NINCDS criteria is strongly supportive of a GBS diagnosis is the absence of fever at the onset of neuritic symptoms. Mrs. Stich had a fever from the onset of her earliest symptoms, on November 23, 1976, until at least November 30, 1976. On November 25th she had a fever of 102 degrees, on November 27th it was 104 degrees, on November 28th it was 102 degrees, and on November 30th it was 100 degrees. This data is clearly incompatible with the seventh NINCDS feature.

*Variants*

Plaintiffs' proofs more closely fit the six variants on the NINCDS clinical features which are strongly supportive of the diagnosis, but a GBS diagnosis is still not demonstrated by a preponderance of the credible evidence.

The first, fever at onset of neuritic symptoms, is clearly met by the same data which was incompatible with the seventh clinical feature (immediately above). Obviously, a patient who failed to meet one of these features would meet the other, and thus neither finding can be very probative, much less conclusive.

The second variant, severe sensory loss with pain, has not been established by plaintiffs' proofs. Prior to the date she became comatose, Mrs. Stich's senses remained fully intact; thereafter no sensory testing could be undertaken. Thus, this variant feature has not been met.

Progression beyond four weeks is the third variant recognized by the NINCDS criteria. It is difficult to fairly determine whether Mrs. Stich's motor weakness progressed beyond the usual four-week period normally associated with GBS because of her comatose and semi-comatose condition. Further, as I have noted above, there is little evidence to support any progressivity in her motor weakness symptomatology, given the sudden and massive nature of the onset of her condition and the overwhelming CNS involvement even in the earliest stages. I must therefore find that plaintiffs have not established by a preponderance of the evidence that this variant is applicable to Mrs. Stich's condition.

The next variant is cessation of progression without recovery or with major permanent residual deficit remaining. I find that Mrs. Stich's condition fits this variant to some degree, given her residual and chronic functional impairments. I also find, however, that this in and of itself does not confirm a GBS diagnosis. This variant simply allows for a finding of GBS when other features point to such a diagnosis but recovery has not occurred. Such is not the case here.

Variant five is sphincter function. Again, because of Mrs. Stich's comatose state, it is difficult to determine whether her observed occasional urine incontinence is due to bladder dysfunction (which would be consistent with this variant) or merely the result of her inability to express herself. I therefore find that the proofs regarding this feature are inconclusive.

Variant six, also known as the Fisher variant, pertains to central nervous system involvement and was the subject of substantial controversy at trial.

The parties are in agreement that Mrs. Stich's condition involves a substantial CNS component. The extent of that involvement, and more basically whether her CNS manifestations may fairly be linked to a diagnosis of GBS or instead reflect an independent, non-GBS CNS dysfunction, were the subject of much dispute. For the reasons which I will outline more fully below, I find that Mrs. Stich's condition reflects a massive CNS dysfunction and pathology unrelated to GBS, and further that her CNS symptomatology vastly exceeds the type

and extent of CNS involvement embraced by Variant Six.

Variant Six expresses the resolution reached by the NINCDS over the proper role of CNS signs or symptoms in the diagnosis of GBS. What Variant Six means is simply that the predominantly peripheral nature of GBS symptomatology need not exclude some CNS signs; in other words, that some evidence of CNS dysfunction in a patient need not *exclude* a diagnosis of GBS.

The NINCDS criteria lists several examples of CNS findings which may occasionally be found in GBS patients, specifically ". . . severe ataxia interpretable as cerebellar in origin, dysarthria, extensor plantar responses, and ill-defined sensory levels. . ." Testimony by Dr. Price also indicated that there is some evidence in GBS cases of trace findings of other CNS involvement such as lymphocytes in the cerebrospinal fluid. All pathological evidence of such CNS involvement under Variant Six should be found, if at all, in the cerebellum rather than the cerebrum.[15]

Findings consistent with Variant Six may not, by themselves, form the basis for a proper GBS diagnosis. Only when a patient presents the recognized typical signs of GBS may the accompanying CNS involvement be reconciled with a GBS diagnosis through the variant. As Dr. Shaumberg has testified, "If someone has a very striking picture of peripheral Guillain-Barre Syndrome, the so-called soft central nervous system findings . . . [don't] bother me." A diagnosis of GBS based overwhelmingly upon Variant Six findings would however transform GBS into an entity not recognized by any substantial body of medical opinion and would be akin to "the tail wagging the dog".

This is, however, what plaintiffs here attempt. Mrs. Stich's overwhelming, "disastrous" and "explosive" cerebral involvement bears little or no physiological or pathological resemblance to the relatively mild symptomatology expected under Variant Six. Her tragic comatose and vegetative state, the demonstrable destruction of brain matter, dysfunction of cognition and memory, hemiparesis and disabling spasticity all point to massive cerebral involvement, rather than the expected cerebellar. None of the potential cerebellar findings listed under Variant Six were ever found in Mrs. Stich's case prior to the onset of her coma, and no such signs were (or perhaps could have been) found thereafter. Therefore, I must find that, in addition to failing to demonstrate that the required peripheral nervous system features are present, plaintiffs have also failed to establish by a preponderance of the credible evidence that her CNS involvement properly falls within Variant Six.

*Cerebrospinal Fluid Features Strongly Supportive of the Diagnosis*

The first feature under this next category in the NINCDS criteria calls for an elevation in cerebrospinal fluid ("CSF") protein levels after the first week of symptoms. The evidence establishes that there was an elevation in CSF protein, and I conclude that this criterion has been met.

The second feature in this category involves CSF cells, specifying that counts of ten or fewer mononuclear leukocytes/mm$^3$ in the CSF are consistent with GBS. The evidence pertaining to this feature is contradictory: On November 27, 1976, Mrs. Stich had a cell count of 200; on December 2, 1976, it was 49; and on December 17, 1976, the count was 0, although on that date there was a count of 372 red cells in the CSF. On balance I find that Mrs. Stich's data fails to meet the requirements for this feature.

The NINCDS criteria provide for two variants on these CSF features, the first allowing for no CSF protein rise in the period of one to ten weeks after the onset of symptoms, and the other accepting counts of eleven to fifty mononuclear leuko-

15. There is no Computed Axial Tomography (CAT) Scan evidence to suggest any cerebral involvement in GBS cases.

cytes/mm$^3$ in the CSF. Based on the foregoing data, I find that Mrs. Stich's condition may meet the requirements of the second variant (regarding CSF cells).

*Electrodiagnostic Features Strongly Supportive of the Diagnosis*

Under the NINCDS criteria, approximately 80% of all GBS cases will have evidence of nerve conduction slowing or blockage at some point in the course of the illness. Conduction velocity is usually less than 60% of normal, but the process is patchy and not all nerves are affected. The NINCDS criteria suggests that distal latencies may be increased to as much as three times normal.

No evidence of slowed or blocked nerve conduction was presented by plaintiffs. To the contrary, the only evidence presented which related to nerve conductivity (and to this criterion as a whole) was the testing done by Dr. Lovelace on February 16, 1977. This testing showed that at least at that time Mrs. Stich's nerve conductivity (conduction velocities) were normal. I must therefore conclude that plaintiffs have not met their burden to establish by a preponderance of the evidence that Mrs. Stich's condition included this feature.

*III. Features Casting Doubt on the Diagnosis*

The first feature identified under the NINCDS criteria as casting doubt on a GBS diagnosis is a marked, persistent asymmetry of weakness. The issue of whether Mrs. Stich's condition is marked by such an asymmetry is seriously clouded by her history of polio. The record contains several references to her residual polio, some of which suggests that it affects both lower extremities, with the remainder specifying that it affects primarily (or only) the left lower extremity. Discounting the evidence regarding her persistently greater left lower extremity weakness, I still find a marked persistent asymmetry in her condition, with her various symptomatology evincing greater left-side involvement. Several reports by Dr. Gluck and Dr. Pertchik note greater upper limb reflex abnormality on the left

than right, a conjugate gaze preference to the left, tremor of the left hand, and other indications of this asymmetry. I therefore conclude that the presence of this feature casts doubt on a GBS diagnosis here.

The next two features which under the NINCDS criteria cast doubt on the diagnosis are (a) persistent bladder or bowel dysfunction, and (b) bladder or bowel dysfunction at onset. Incontinence of urine was noted for Mrs. Stich following the onset of her coma, but it is impossible to determine whether this was due to dysfunction or her inability to communicate. For this reason I find the evidence inconclusive as to these two features.

The fourth feature in this category is a finding of more than fifty mononuclear leukocytes/mm$^3$ in the CSF. As I have noted earlier, the first measure of Mrs. Stich's CSF cells, on November 27, 1976, revealed that she then had a count of 200 mononuclear leukocytes/mm$^3$. Although the count was later found to be lower, I find that this initial high level is evidence which casts doubt on a diagnosis of GBS.

The final two features which, under the NINCDS criteria, cast doubt on the diagnosis are (a) the presence of polymorphonuclear leukocytes in the CSF, and (b) a sharp sensory level. The absence of any findings bearing on these two features leads me to conclude that they are inapplicable.

In conclusion, I find that plaintiffs have failed to establish by a preponderance of the credible evidence that Mrs. Stich's symptomatology fits the NINCDS GBS criteria. Specifically, I find that plaintiffs have failed to demonstrate that her condition includes the two features required for a diagnosis of GBS, and that they have similarly failed to demonstrate the applicability of most of the features which are strongly supportive of such a diagnosis. I find further that plaintiffs' evidence of central nervous system involvement in Mrs. Stich's condition does not meet the standard for Variant Six, and that in any event Variant Six findings in and of themselves are insufficient here to sustain a GBS diagnosis, given the lack of other evidence. Fi-

nally, I find that several features are present in her condition which, under the NINCDS criteria, cast doubt on a GBS diagnosis, even if all other findings had been typical. Therefore, I must conclude that plaintiffs have failed to sustain their burden of proof as to this diagnosis.

## GENERAL OBSERVATIONS REGARDING PLAINTIFFS' PROPOSED DIAGNOSIS

In the final pretrial order of the multidistrict swine flu litigation, the United States stipulated that GBS can be caused by a swine flu inoculation in certain instances. In this case, no doctor who ever either saw Mrs. Stich or reviewed her file prior to this stipulation ever diagnosed her as having GBS. There is no evidence that any doctor even considered that GBS *might* be the correct diagnosis during this period. Prior to November of 1979, neither Dr. Gluck nor any of the consulting neurologists at Riverview Hospital diagnosed her as having GBS or even included it in a differential diagnosis. At Columbia Presbyterian Hospital, where the physicians and neurologists who examined her had the benefit of many of the most advanced and sophisticated neurological testing procedures, GBS was never even considered to be a plausible diagnosis. Mrs. Stich's medical records simply never established a basis for such a finding.

Mrs. Stich's condition is, as her medical records so clearly demonstrate, overwhelmingly a central nervous system disease. There is no evidence of any peripheral involvement at any time within the first twelve weeks after she received the swine flu inoculation. All symptoms and signs were of indisputable brain damage which devastated the cerebral area. Plaintiffs have failed to meet their burden of establishing that the few arguable peripheral nervous system findings in this record constitute GBS. Nor have plaintiffs demonstrated that her condition is explainable by the GBS variant which recognizes that in certain limited circumstances, where other signs are typical of GBS, findings which may be cerebellar in origin need not ex-

clude the diagnosis. Plaintiffs' suggestion that the definition of GBS be broadened to include the kind of overwhelming CNS involvement as is found in her condition cannot be accepted, particularly where, as here, the essential signs of GBS are absent.

## PLAINTIFFS' EXPERTS

### Dr. Joseph Gluck

Mrs. Stich's primary treating physician was Dr. Joseph Gluck. Dr. Gluck, by his own admission, has ministered to her and been a friend of the family for many years. From November of 1976 until August of 1980, one looks in vain for any mention by Dr. Gluck which even remotely suggests a diagnosis of GBS. The record reflects that in the summer of 1980, Dr. Gluck suffered a heart attack. While recovering, he, as plaintiffs suggest, was "afforded the luxury" of conducting "an exceptionally thorough review of the medical literature concerning Guillian-Barre Syndrome." The doctor, as I observed, brought to court a Niagara of articles, many of which he referred to in the course of his testimony. His thesis, based on his readings, is facially attractive: Since many medical writers, including Dr. Guillian himself (in 1953), have recognized that GBS can have CNS features, he opined that Mrs. Stich's case fits neatly into this diagnostic syllogism.

Defendant has attacked Dr. Gluck's opinion on many grounds: First, that he did not arrive at this opinion until the eve of trial (in September of 1980), thus suggesting, inferentially, that that opinion was colored by a stipulation by the government that it would compensate a causally related GBS. If I felt that Dr. Gluck had persuaded me that his later readings had shed light on this perplexing problem, I would not have been phased by his intensive, albeit tardy, research. However, in listening to Dr. Gluck, and observing him as a witness, I became convinced that I was listening to a physician who had an intense emotional investment in this case. On various occasions he broke down into tears in the course of his testimony. While I am in no way critical of this loss of composure, I do sincerely

believe that it reflected a deep personal desire to make up to the Stich family for what he considered to be a serious lapse in medical judgment during the prior three years. Indeed, there were times when I felt that this expert witness had, by choice, transformed himself into an expert advocate. Considering Mrs. Stich's tragic situation, one can well understand his remorse. However, carefully considered, his opinion must be rejected in the face of the overwhelming amount of contrary clinical and other evidence which has been adduced in this case. Considered together, this evidence suggests that Dr. Gluck's failure to diagnose Mrs. Stich's condition as GBS from November 1976 to September of 1980 was not incompetence.

## Dr. Howard Medinets

Dr. Howard Medinets' opinion as to diagnosis and causation on behalf of the plaintiffs is rejected by this court for somewhat different reasons. Dr. Medinets has been practicing neurology and neurosurgery since 1950. He felt that Mrs. Stich suffered from encephalomyeloradiculopathy. He testified that she had both peripheral nervous system and CNS involvement. Boiled down, it was Dr. Medinets' conclusion that Mrs. Stich's peripheral neuropathy could be classified as a GBS and her CNS pathology as a meningo-encephalitis. While I have considerable regard for Dr. Medinets' qualifications, I find that his opinion as to diagnosis and causation is unpersuasive. For example, Dr. Medinets ruled out Herpes Simplex Encephalitis because of the results of the complement fixation test, the validity and efficacy of which was seriously questioned by the recent research referred to in the testimony of Drs. Price and Whitley (discussed *infra*). I am convinced that Dr. Medinets was not sufficiently discriminating or meticulous in giving consideration to the various possible causes of Mrs. Stich's condition, particularly those relating to a viral etiology.

## Dr. Charles Poser

Dr. Charles Poser had no hesitation in causally relating Mrs. Stich's condition to the swine flu inoculation she received or in diagnosing it as GBS. His precise diagnosis was that she had an encephaloradiculoneuropathy. He felt that her condition falls within the spectrum of diseases described in the medical literature as disseminated vasculomyelinopathy, and which could be diagnosed neurologically as GBS. He also had no hesitation in stating that Mrs. Stich's neurological conditions met the requirements of the NINCDS criteria.

It was obvious to me that while the doctor has had extensive interest in and exposure to GBS, his opinion as to the nature of that condition is a distinctly minority view, and not one shared by an overwhelmingly impressive body of medical opinion. In listening to Dr. Poser, I had the distinct impression that his was a "voice crying out in the wilderness". If I felt that his theory, as applied to the facts of this case, made sense in light of the evidence presented, I would have no hesitation in embracing his rationale. I decline to do so, however, because I find that his general opinion as to the nature of GBS is contradicted by the overwhelming weight of credible medical opinion presented to this court. Secondly, his diagnosis in this particular case is, in my judgment, faulty. I had the distinct impression that Dr. Poser took the pathological picture presented by Mrs. Stich in this case and attempted to mold it to fit his own almost unique theories. A square peg cannot fit into a round hole. Although I was highly interested in his theories, I find that they do not form a sufficient qualitative basis in this case to permit me to conclude that plaintiffs have met their burden of proof.

## Dr. Robert Lisak

The record will reflect that I questioned Dr. Robert Lisak extensively. His expertise in the field of neurology was conceded by the government. After acknowledging his familiarity with the NINCDS criteria, he acknowledged that his "boss", Dr. Arthur Asbury, (chairman of the NINCDS Committee) had "made them [the criteria] up". It was his opinion that Mrs. Stich had post-immunization encephalomyelitis, and that she also had "involvement of the nerve

roots or possibly of the peripheral nerves as well, which would then give her encephalomyeloradiculitis. The radiculitis would be compatible or a part of the Guillian-Barre Syndrome." With respect to her central nervous system condition, it was his opinion that she was suffering from acute disseminated encephalomyelitis (ADEM).

I think it is fair to conclude that, after extensive questioning on my part, the doctor stated that he felt that Mrs. Stich's condition fit the NINCDS criteria, particularly Variant Six. In this process I had attempted to carefully ascertain that I understood where Dr. Lisak stood with respect to this extremely difficult case. After questioning Dr. Lisak, I felt that the opinion he expressed regarding the diagnosis was couched with considerable hesitancy. He appeared to be far more certain regarding the problem of causal relationship between the inoculation and alleged result than he was with diagnosis. I was quite impressed with the quality of his testimony, yet I retain serious doubts whether his hesitant and perhaps vacillating opinion provides a sufficient basis for plaintiffs to carry the day.

## GENERAL CONCLUSIONS REGARDING EXPERT TESTIMONY

I was also tremendously impressed by most of the testimony presented by video deposition, which significantly undermined the general theses offered by Drs. Poser and Gluck. While I acknowledge Dr. Neil Nathanson's eminence in the field of epidemiology, it is my opinion that an epidemiological solution to this particular problem is not one which I can adopt, either way.

In sum, I find that, when carefully evaluated, plaintiffs' essential thesis strains my credulity. The net impression I have is that plaintiffs' expert witnesses made a valiant effort to persuade this court on the issues reserved for this phase of the case. That effort, I find, has failed, for reasons I have expressed and will express later in the body of the opinion.

## THERE IS NO EVIDENCE OF A DEMYELINATING PERIPHERAL NEUROPATHY

As defined earlier, GBS is clearly a demyelinating peripheral neuropathy. As Dr. Medinets testified, demyelination involves the stripping away of the myelin sheath around the nerve, the result being that a demyelinated fiber cannot conduct any nerve impulses at all. Despite the interpretation of the EMG reports in this case by plaintiffs, I find that there is insufficient credible evidence of peripheral nerve involvement in Mrs. Stich's upper extremities at any time. Dr. Medinets noted that slowed nerve conduction, or absence of conduction, does not necessarily mean demyelinating disease.

And further, the EMG reports of Drs. Lovelace and Anayotis (and the interpretation of these reports by Drs. Tsairis, Price and Goodgold), which I will more fully discuss below, indicate that there is no persuasive evidence of a demyelinating peripheral neuropathy. On the contrary, Mrs. Stich's condition manifested itself overwhelmingly in the central nervous system.

Dr. Lovelace, in his report dated February 16, 1977, concluded that Mrs. Stich showed evidence of lower motor neuron disease at the anterior horn cell level. That conclusion, as evidenced by the normal conduction velocities on EMG, indicates that plaintiff was suffering a CNS disorder, not a demyelinating peripheral neuropathy. Two factors make this conclusion inescapable. First, there was no evidence of slowed conduction, as motor conduction was found to be normal. Second, the involvement of the nerve was at the anterior horn cell level which is part of the central nervous system, not the peripheral nerves. Thus, because of the lack of findings supportive of a demyelinating peripheral neuropathy, Dr. Lovelace's EMG report is not evidence that Mrs. Stich had GBS; in fact, it supports the contrary conclusion.

A similar conclusion must be drawn from the report by Dr. Anayotis from March 1980. The most that can be fairly drawn from this report is that some denervation

can be identified. There is no basis, however, for finding demyelination of the peripheral nerves. Further, Dr. Price testified that Dr. Anayotis was wrong to base his conclusion on a single conduction velocity (right perineal nerve) that is low normal, not abnormal. Dr. Tsairis found that the denervation that was identified on EMG testing involved both lower extremities was consistent with denervation of some part of the lower motor neuron but not consistent with damage to the motor axon (*i.e.,* not peripheral).

The Anayotis report also identified fibrillations in several muscle groups. This is not significant, however, because one does not find fibrillations or fasciculations in a demyelinated peripheral nerve; fibrillations, as Dr. Medinets testified, are, rather, a definite indicator of anterior horn cell involvement. In fact, because of the involvement at the anterior horn cell level, any absence of conduction in the peripheral nerve is more likely secondary to a central nervous system condition. In summary, Dr. Anayotis' EMG study, including the F wave response and the conduction velocities, is not compatible with a peripheral neuropathy.

Both Dr. Lovelace's and Dr. Anayotis' reports were subject to the scrutiny and analysis of Dr. Joseph Goodgold in Dr. Goodgold's deposition testimony on October 27, 1980. Dr. Goodgold, director of the Electrodiagnostic and Neuromuscular Disease Service at New York Hospital and a prominent expert in his field, found that these two reports, even considered together, could not support a diagnosis of GBS. Several factors contributed to this judgment. First, much emphasis was placed by plaintiffs upon the motor conduction velocity of the right perineal nerve from the head of the fibula to the ankle which Anayotis reported as 45 meters/sec or *low normal.* That measurement, however, is considered and recorded as *normal* in Dr. Goodgold's laboratory (as well as in Dr. Tsairis' laboratory).

Further, in referring to the fibrillations identified by Anayotis, Dr. Goodgold testified that he cannot tell one way or the other whether they are evidence of GBS or anterior horn cell disease. In fact, Dr. Goodgold admits that he cannot rule out anterior horn cell disease as the cause because he does not have enough information from Anayotis' report or from Lovelace's report to rule it out. In referring to the inability to obtain conduction velocities in the lower extremities, Dr. Goodgold agreed with Dr. Tsairis that the reason they could not be obtained was "because of the severe atrophy due to extensive denervation in all distal muscles on the needle EMG study", [and not because of peripheral demyelination].

Dr. Goodgold also found that the fibrillation potentials which Dr. Lovelace found (which plaintiffs suggest is a sub-clinical sign of peripheral nerve involvement) are not reliable because of atrophy and residual weakness due to Mrs. Stich's history of polio. As Drs. Price and Tsairis confirmed, it is known among polio specialists and electromyographers that old polio will produce EMG abnormalities for many years—greater than twenty and perhaps up to sixty—after the acute phase of the polio has passed. Mrs. Stich's left leg was clearly involved with polio and muscle loss was the residual deficit. Whether the right leg was also clinically involved is unclear from the medical records, but it is quite likely that the right leg was at least sub-clinically involved with polio. Dr. Tsairis, whose subspecialty is electromyography, testified that he knew of many cases of old polio in which the patient believes only the left leg to be affected, but sensitive EMG studies will show right leg denervation as well. Recent research confirming this phenomenon was also brought to the Court's attention by him.

Here, I agree with defendant that Mrs. Stich's left leg EMG findings by Dr. Anayotis of fasciculations in March of 1980 were identical to those in the right leg; that the left leg has findings characteristic of old polio supports the proposition that the right leg was also previously involved, leaving a similar deficit at the anterior horn cell lev-

el. Polio is, of course, an anterior horn cell disease. The Lovelace EMG finding of a disease process at the anterior horn cell level is consistent with the findings one would expect in the EMG of a muscle affected many years before with clinical or subclinical old polio. Accordingly, the electromyographic findings which have been interpreted as indicative of anterior horn cell disease may indeed arise from the polio involvement that plaintiffs' experts chose to ignore.

Finally, the Lovelace report is the only arguable evidence of denervation of the facial nerves in this case. It is highly significant that neither Dr. Lovelace nor Dr. Goodgold concluded that this was proof of peripheral nerve demyelination. Lovelace instead identified the involvement at the anterior horn cell level, which, as I pointed out previously, is in the central nervous system. The face fibrillations in the Lovelace report, which are rated at one-plus, are, as Dr. Price testified, minor subclinical nonspecific findings. GBS can never be diagnosed from an isolated finding of fibrillations, which are not tantamount to weakness.

For all of the above reasons, the EMG evidence fails to prove that Mrs. Stich suffered from a demyelinating condition of the peripheral nerve in 1976 or at any subsequent time. Dr. Goodgold's opinion, that he cannot conclude from these reports that there is evidence of demyelinating peripheral nerve disease to a reasonable medical probability, casts substantial doubt on the plaintiffs' position.

## MRS. STICH'S CONDITION IS A VIRAL ENCEPHALITIS: MOST PROBABLY HERPES SIMPLEX ENCEPHALITIS

■ The record indicates that virtually every treating physician's diagnosis was either viral encephalitis, encephalomyelitis, or encephalitis of unknown etiology. The final discharge diagnosis at Columbia Presbyterian Hospital was also viral encephalitis. After carefully reviewing the evidence, I find that Mrs. Stich's condition is, to a reasonable medical and legal certainty, Herpes Simplex Encephalitis.

Encephalitis is an inflammation of the brain. Viral encephalitis is the most common form of encephalitis and is usually characterized by localized lesions in the brain. HSE, in turn, is the most frequently found viral encephalitis in humans, and is caused by the herpes simplex virus. This virus is usually benign, but for unknown reasons it may attack the temporal lobe or the inferior part of the frontal lobe, thereafter sometimes extending back into the occipital, parietal and frontal areas.

In HSE cases the virus typically causes localized involvement first, with affected brain cells becoming swollen and edematous. The disease, as detected by such edema, normally begins in the gray matter, but may spread through the white matter (neural tissue which typically underlies the cortical gray matter, or is gathered into central tracts and peripheral nerves) as the infection progresses. The acute phase of HSE, with the virus infecting the cortex and subcortical white matter, leads eventually to severe necrosis. The host eventually may bring the virus under control, but not before irreversible brain damage is done. Where HSE is untreated, the infection may become bilateral, meaning that the opposite side of the brain may become involved, and the virus may continue its destructive process.[16]

HSE, as a predominantly focal disease, usually produces neurological signs on the opposite side of the body from the sector of the brain which is involved; such signs include central nervous system weakness, focal seizures, one-sided pathological responses, and hemiparesis (implying frontal area involvement) or hemianopsia (implying occipital area involvement). Onset of HSE is typically accompanied by fever and headache, focal neurological symptoms, behavioral disturbances, and altered consciousness. HSE is the most common non-epi-

16. Upon biopsy or autopsy of the brain in an HSE case, the presence of the virus will be found bilaterally but in larger quantities where the disease began.

demic cause of fatal rapid-onset disorder of the central nervous system; it is a devastating condition which is fatal for approximately 75% of all patients. Those who survive suffer a severe neurologic deficit due to destruction of part of the brain. The typical residual disabilities include hemiparesis and disorders of cognition, thought and memory.

*Diagnosis of HSE*

The credible testimony indicates that the only sure method to diagnose HSE is by a brain biopsy of the affected brain material.[17] Mrs. Stich, of course, never had a brain biopsy performed, primarily because her transfer to Columbia Presbyterian Hospital occurred too late in the course of her condition to provide the opportunity for a meaningful test. Reliance must therefore be placed instead on the recent advances in the diagnostic tools available for establishing an HSE diagnosis to a medical and legal certainty.

Primary among the recent diagnostic advances is the work of the National Institute of Allergy and Infectious Diseases ("NIAID") Collaborative Antiviral Study Group, and particularly that of its principal investigator and director, Dr. Richard Whitley. The protocol of the Collaborative Antiviral Study Group is the diagnosis and therapy of HSE. The group began with the participation of thirteen medical institutions, and this number expanded to twenty-two in 1976. By 1981, there were forty-five participating medical institutions throughout the United States, Canada, England and Sweden. The Group has had the benefit of the study of two hundred and fifteen patients presenting signs of encephalitis, each of whom has undergone a biopsy. The results of these studies, first reported in the medical literature in August of 1977[18] and in various scholarly articles thereafter, have provided the medical community with the best available means, other than (or prior to) biopsy, of predicting whether a given patient has HSE. In practice, the Group's findings are regularly employed as the criteria for establishing a tentative HSE diagnosis, which would, in turn, lead to a biopsy procedure to confirm the diagnosis and, if confirmed, admit the patient to an experimental antiviral drug therapy. I adopt the NIAID Collaborative Antiviral Study Group's findings or criteria for the limited purpose of determining whether or not the evidence herein suggests that HSE is the most probable diagnosis of Mrs. Stich's condition.[19]

It has been known for some time that HSE, being primarily a focal encephalitis, may be detected through the use of Computer Axial Tomography ("CAT") and technetium radionucleid-type brain scans and electroencephalographs ("EEGs") which may reveal the location of focal lesions in the brain. The presence of such focal lesions would support the diagnosis of HSE and contraindicate the diagnosis of post-vaccinal encephalitis. The Collaborative Study Group has found that the EEG, brain scan and CAT scan are the three best non-invasion (non-biopsy) tools or studies to correctly predict an HSE diagnosis. Clinical findings alone, such as fever, CSF pleocytosis, consciousness and convulsions, have been found insufficient in and of themselves to predict or confirm such a diagnosis, although they may create the initial suspicion.

17. Even a negative brain biopsy may not be wholly reliable in ruling out an HSE diagnosis because of the possibility that the affected site will be missed by the biopsy procedure.

18. This seminal report of the Group was published as Whitley, et al., *Adenine Arabinoside Therapy of Biopsy-Proven Herpes Simplex Encephalitis,* and appeared in the New England Journal of Medicine, Volume 297 at pages 289–294 (August 1977) (Exhibit D–37).

19. Although doctors at Riverview Hospital treating the plaintiff in late 1976 and early 1977, during the acute phase of her illness, did not have the benefit of the Collaborative Study publications, they nonetheless considered HSE. The diagnosis of HSE was likewise considered by the physicians at Columbia Presbyterian and later in the discharge from Riverview to Morris Hall. In fact, Dr. Poser testified that HSE is the most common viral encephalitis, and it is the only one that should be considered seriously in New Jersey in the winter.

The Collaborative Study Group has recently published its most current research in an article in the Journal of the American Medical Association. *See* Whitley, *et al., Herpes Simplex Encephalitis: Clinical Assessment, Journal of the American Medical Association,* (January 1982). The essential data included in that article summarizes the Group's experience with 176 patients who presented with signs of focal encephalitis. All of these patients were biopsied at the suspected brain site; as a result, a diagnosis of HSE was confirmed in 101 patients and not confirmed in the remaining 75. The data which the Collaborative Group collected were then analyzed to determine whether there were findings and symptoms which were common to the HSE group as distinguished from the non-HSE group. All tabulations were verified by virologists, neurologists, and biostatisticians, who checked by double-blind methods for the accuracy and proper categorization of the patient data. The resulting findings are reproduced here as Table 1: [20]

Table 1

Herpes Simplex Encephalitis

Diagnostic Assessment

Within Three Days of Biopsy

| EEG | Brain Positive | | Brain Negative | |
|---|---|---|---|---|
| Focal | 58/73 | (81%) | 39/66 | (59%) * |
| Generalized | 44/72 | (61%) | 41/62 | (68%) |
| Spikes | 40/70 | (57%) | 14/58 | (24%) * |
| Slow Activity | 65/72 | (90%) | 52/62 | (83%) *** |
| Brain Scan Localization | 37/74 | (50%) | 6/44 | (14%) * |
| CAT Scan Localization | 33/56 | (59%) | 8/37 | (22%) ** |
| Any one or More Assessment of Localization | 83/101 | (82%) | 47/75 | (60%) * |
| Two or More Positive Results | 31/64 | (48%) | 9/50 | (18%) * |

\* P = 0.001
\*\* P = 0.01
\*\*\* P = NS

Defendants point out and I agree that there is a statistically significant difference between the incidence of focalized EEG, brain scan and CAT scan in the brain positive (*i.e.* actual HSE) group of patients. A focal EEG was found in 81% of the HSE group (59 out of 73 patients), and only 59% of the brain negative (*i.e.* non-HSE) group of patients. Similarly, spiked wave activity was found in the EEG of 57% of all HSE cases, but only 24% of the non-HSE cases.

Generalized EEG activity was, however, a common feature of both groups, being found in 61% of the HSE patients and 66% of the non-HSE patients. Slow activity was also a common EEG feature of all patients who presented with signs of focal encephalitis, being present in 90% of the HSE group and 84% of the non-HSE group. While it would be incorrect to conclude from this data that HSE has a pathognomonic or uniquely characteristic EEG, the presence of such focalized activity and sharp wave spikes does make HSE a more likely diagnosis for a given patient than any other type of encephalitic condition.[21]

**20.** The data was included in the article as Table 4.

**21.** These focal changes, particularly the sharp waves and spikes, which are often accompa-

The Collaborative Study Group also found that CAT scans are a useful diagnostic tool in HSE cases. While there are numerous reports of HSE CAT scans in the literature, their research confirmed that in CAT scans of a patient in the acute phase of illness one expects to find localization of involvement in the attack area and those areas to which the disease has spread. The Collaborative Study Group found CAT scan localization in 59% of the HSE cases (33 of 56 patients), but in only 22% of the non-HSE cases (8 out of 37 cases). The Collaborative Study Group found this difference to be statistically significant at the 99% level of confidence.

Similarly, the Collaborative Study Group found that the technetium radionucleid-type brain scan is a useful method for showing disruption of the blood brain barrier in Herpes Simplex Encephalitis cases. The brain scan provides a good early warning of the areas which may be involved, although it does not necessarily give the precise location of the HSE lesions. The Collaborative Study Group found that 50% of the HSE patients had evidence of brain scan localization (37 out of 74 patients); only 14% of the non-HSE cases (6 patients out of 44) exhibited localization on their brain scan. Thus, a patient with a focal brain scan is more likely to have HSE than any other encephalitis. The statistical level of confidence for this difference was found to be 99.9%.

Overall, one finds at least one instance of localization (either EEG or brain scan or CAT scan) in 82% of the HSE cases (83 out of 101 patients), but in only 60% of the non-HSE cases (47 out of 75 patients). The

evidence is even more compelling with respect to a finding of two or more positive results. One finds that when the EEG, brain scan, and CAT scan are performed, two or more of those indicators will show localization in 48% of the HSE cases, but in only 18% of the non-HSE cases. The statistical measure of confidence for these differences was found to be 99.9%.[22]

Finally, the Collaborative Study Group and others have documented the typical HSE or viral encephalitis findings with respect to an analysis of cerebral spinal fluid. Ordinarily, the patient will show an elevated opening pressure, an elevated white blood cell count (usually mononuclear lymphocyte rather than polys), elevated protein, normal glucose, and red cells may be present.

In sum, the research of the Collaborative Study Group has led me to the conclusion that HSE may be presumed if a patient presents with altered mentation, fluctuating consciousness, signs of central nervous system disorder, localization through neurological or clinical findings, localization established through the diagnostic tools of the CAT scan, EEG or brain scan, and CSF findings compatible with the presence of a viral infection.

When the facts of this case are applied to the findings of the Collaborative Study Group, the conclusion is inescapable that Mrs. Stich's condition is Herpes Simplex Encephalitis, and that she is today left with the residuals of that disease. The evidence clearly establishes that it is approximately 85% probable that the plaintiff had HSE, because of the strong focalization factors and other evidence.

nied by generalized background abnormality in the EEG, are thought to be caused by the irritative area of infection of the Herpes disease process.

**22.** Special attention was paid by the Group to finding an explanation for why nine (9) patients who were not found to have HSE nonetheless had positive focal findings in at least two of the three indicators. (See Exhibit D–46.) Alternative explanations were clearly identified in all

nine (9) cases. The diseases, which produce results (by CAT scan, EEG and brain scan) mimicking HSE in these patients, were found to be as follows:

Three brain abscess cases
One cryptococcal disease case
Two Epstein-Barr virus cases
One toxoplasma gondii infection case
One tuberculosis case
One brain tumor case.

When Mrs. Stich was first admitted to the Riverview Hospital Emergency Room she had clear signs of focal encephalitis which were quickly confirmed by evidence of localization on her EEG, CAT scan and brain scan.

The EEG evidence from the acute phase of her illness showed focal sharp waves and spikes typical of HSE. Such abrupt wave signs are indications of discharges from the cortex associated with focal seizures. The spiked wave activity and slow wave component in the EEG results for Mrs. Stich showed focal impairment localized on the posterior aspect of the right temporal lobe. It was also noted that the background frequency on Mrs. Stich's EEGs slowed, showing an overall picture indicative of HSE.[23]

Mrs. Stich's CAT scans provide further evidence of focal involvement. Dr. Price testified that CAT scans in confirmed HSE cases have been seen that looked remarkably similar to those found in this case.

In HSE cases, the earlier CAT scans are the more important because they show more extensive and focalized disease and greater edema throughout the brain; later in the disease process, edema is lessened and brain substance is lost, thereby causing CAT scan results to be less indicative or reliable.

Mrs. Stich's first CAT scans, taken on December 4, 1976, are distinctly abnormal. The inferior portion of the frontal lobe and the temporal lobe are abnormal, and edema is present throughout the medial frontal region and the temporal region; there are severe temporal and inferior temporal abnormalities on these scans, with an obvious mass effect pushing from right to left and shifting the midline of the brain. The generalized edema in the temporal lobe extends through the temporal/occipital region in the lower parts of the brain. Her earliest CAT scan shows involvement on the left side which is bad but on the right side which is much worse. Such involvement through

these two focal areas of involvement, one in each temporal area, is consistent with HSE.

The lower CAT scan cuts are important because they show the temporal lobes which bear the brunt of HSE involvement. If this were instead a white matter disease, the involvement would show in the middle two higher cuts. In fact, there is less abnormality as one goes up into the white matter. The pathology shades from very abnormal down low into close to abnormal up higher, with the focal pathology being present in the temporal areas.

By December 27, 1976, the CAT scans taken of Mrs. Stich showed evidence of reduced edema. Abnormalities were noted in the medial inferior frontal region in the lower cuts, while the higher cuts do not appear to be abnormal. Gray matter atrophy appears to have caused the enlargement of the Sylvian Fissure noted in later CAT scans. Other findings are present which are not well delineated, suggesting, as Dr. Price noted, that the disease has spread. The December 27, 1976 CAT scan is not inconsistent with HSE.

The February 17, 1977 CAT scan series reveals a doughnut lesion in the cortex near the posterior temporal/occipital junction, close to the surface. This most likely represents an area of necrosis with surrounding reaction, rather than an area of active hemorrhage. The white matter in the upper cuts appears to be normal, suggesting (as did the earlier CAT scans) that this disease process is not ADEM, because ADEM is not a cortical (gray matter) disease.

The March 7, 1977 CAT scan is similar to the February 17th series. It is unclear from the two series whether the doughnut-shaped ring is the same or slightly decreasing in size. Both are consistent with a diagnosis of HSE, showing the breakdown of tissue and a decrease in edema. As Dr. Price testified, a CAT scan, if taken today, would be likely to show the loss of brain substance and atrophy which is the residual legacy of the HSE pathological process.

---

**23.** I find that the testimony by Dr. Poser that sharp waves and spikes were not present on the EEG (Transcript at 1277) is incorrect, and his basis for ruling out the diagnosis of HSE on this ground is erroneous.

The technetium brain scans performed on Mrs. Stich on December 2 and December 9, 1976, were also abnormal and focalized. Although the December 2nd brain scan had become unavailable as of the time of trial and was therefore not introduced into evidence, a report written by Dr. Pertchik (based on this brain scan) described a lesion in the right side of the brain, which is suggestive of a finding in line with the NIAID Collaborative Study Group's criteria.

Even without the perhaps uncertain brain scan evidence, however, Mrs. Stich had two of three findings for localization on the right side of the brain during the critical first seven days of her hospitalization. Patients having at least two positive results on these parameters, according to the findings of the Collaborative Study Group, will have a significantly higher probability of having HSE than another disease. The data show a significant difference between HSE and non-HSE cases on this point at a 99.9% confidence level.[24] From the findings of the biopsy studies of 176 patients of the Collaborative Antiviral Study Group, these findings must be interpreted as HSE in 31 out of 40 cases of patients presenting with two or more positive results, with the remaining nine cases having been explained as viral-related conditions, brain abscesses, and tumor. Out of 176 patients studied, none fitting the plaintiff's profile had a disease other than HSE or one of this group of circumscribed viral encephalitis or brain abscesses or tumors.

The cerebrospinal fluid (CSF) findings from Mrs. Stich lend further support to a diagnosis of viral encephalitis, and particularly of HSE. The white cell counts in Mrs. Stich's CSF samples are highly significant. HSE patients have a higher white cell count than non-HSE patients in their cerebral spinal fluid. The presence of elevated counts of white cells, and particularly of lymphocytes, is a sign that the body is fighting an acute infection of the brain.[25] In this case, Mrs. Stich's CSF white cell count of around 200 cells is typical of the average HSE case. The lymphocytes in particular predominate in her CSF findings. The cells go from 92% lymphocytes on November 27 to 97% lymphocytes on December 2. Again, during the acute phase of illness, the CSF findings concerning white blood cells are highly confirmatory of HSE.

The elevated opening pressure in the spinal taps, where readings were taken, should also be noted. An elevated CSF pressure is characteristic of HSE, as it is caused by the increased intracranial pressure resulting from the swelling of the brain cells. The opening pressure of 350 in the December 2, 1976, spinal tap is distinctly abnormal and is a characteristic finding in the acute phase of an HSE case: The opening pressure trend decreases, diminishing as the acute phase of HSE passes, and it was reduced in this case to 190 on February 12 and 110 on February 15, 1977.

The finding of red cells in the CSF is a fairly consistent finding in HSE cases: Blood may be spilled into the spinal fluid because HSE is a hemorrhagic disease in which the blood/brain barrier is injured. The finding of red cells (at levels of between ten and five hundred or more cells) is not specific as to HSE but is a relatively common finding in HSE cases. Mrs. Stich's red blood cell count findings went from eight to twenty-four to three hundred seventy-two to one to thirty-one. These findings are consistent with a diagnosis of HSE. Although some experts have said that elevated red cells in the CSF are "unequivocal evidence" of HSE, the findings of the Collaborative Study Group do not compel such

24. When one considers that the technetium brain scan of December 2 also suggests a finding of focality of the brain lesion area, all three neurodiagnostic tools—EEG, CAT scan, and brain scan—are positive for focality during the first seven days of hospitalization, as the patient was lapsing into unconsciousness and coma.

25. Another type of white cells in the CSF are polymorphonuclear leukocytes, which are also a sign of the body fighting acute infection, especially bacterial infections. Because HSE is a viral infection, these cells are not normally found in such cases.

a conclusion, as the pattern of red cell findings in HSE patients is not uniform.

In this case xanthrochromia—a yellow tinge to the cerebral spinal fluid—was also detected. Xanthrochromia is a characteristic finding in HSE cases because it is evidence of the presence of red cells in the CSF which have released hemoglobin. This hemoglobin is then converted to bilirubin, giving the fluid a characteristic yellow tinge. Xanthrochromia was specifically noted in the December 2 spinal tap, suggesting earlier hemorrhage.

Finding of elevated CSF protein is another nonspecific finding which supports the diagnosis of HSE. The elevation of protein is caused by the destruction of brain tissue and its breakdown within the CSF, which is also consistent with viral encephalomyelitis. Moreover, the persistent rise in CSF protein in this case may be caused by the diabetic condition superimposed upon the HSE.

It should be further noted that the presence of white cells in this case, particularly lymphocytes, when accompanied by increased CSF protein, is a condition of pleocytosis which is a characteristic of HSE and practically unknown in GBS cases.

The attack site in the brain and involvement of the various brain lobes in Mrs. Stich's condition provides additional support for an HSE diagnosis. Generally, the temporal lobe is the most common attack site for the Herpes virus, in 80–85% of the cases. The frontal lobe is attacked in 7–8% of the cases, as is the parietal lobe. The occipital lobe is the principàl attack site in only 1–2% of HSE cases. The greater incidence of HSE involvement in the temporal lobe is caused by its greater susceptibility to the virus. In the present case, temporal lòbe involvement was seen in the earliest CAT scans, as noted above, and the EEG detected abnormality in the rear temporal/parietal/occipital junction. Support exists in the medical literature for such a combination of focal abnormalities in HSE patients. In a study of 11 patients with confirmed HSE, 5 had abnormal CAT scans of which 3 showed extension into the occipital region of the brain. Dutt, *et al., Computed Tomography and EEG in Herpes Simplex Encephalitis,* 39 Archives of Neurology (1982). (Exhibit D–53). Focal abnormalities in the EEG were also seen in two of the three patients exhibiting occipital area involvement. *Id.*

The findings of right brain involvement by CAT scan, EEG and brain scan were confirmed by the neurological symptoms manifested on the opposite side of the body, namely: eyes were deviated to the left, the left arm was spastic, edema shifted the brain from right to left, a left Babinski reflex was noted, left central nervous system facial weakness was noted. It is clear that the right brain had more involvement than the left from the start, a status which is reflected in the symptoms that continue today.

Finally, the course of Mrs. Stich's condition, from onset until today, is typical for HSE. The onset of the plaintiff's disease was typical, manifested by high fever, abnormal behavior, focal seizures, eyes deviated to the left, elevated protein, white cells in CSF, and rapid progress toward coma.

After onset, the course remained typical of HSE, presenting severe motor difficulties of the upper motor neuron type (*i.e.,* originating in the central nervous system). These upper motor neuron motor difficulties included the left hemiparesis noted at Columbia, the left upper motor neuron facial paralysis, the left arm and left leg spasticity, the severe disorder of all four extremities, predominantly the left side. This course was indicative of supra-temporal destruction of brain with residuals caused by HSE. The signs of central nervous system involvement included exaggerated reflexes, the Babinski reflex, spasticity, ankle clonus, and abnormal EEG. (Gluck at 2674.)

Mrs. Stich's mental status deteriorated as coma eventually resolved into a persistent vegetative state. Today, marked memory disorder and numerous problems in the cognitive spheres continue to persist, all of which are hallmarks of HSE. The present condition shows obvious sequelae of severe encephalitis, including serious dysfunction of cognition, memory, behavioral changes,

and impaired higher cortical functions; there continues to be marked upper motor neuron type (*i.e.*, central nervous system) difficulty in all four extremities, predominantly the left, and especially in the legs. The continued spasticity today is another example of a typical residual of Herpes Simplex Encephalitis, and it is noted that medications for spasticity have continued since the early course of this disease.

The left homonymous hemianopsia, a central nervous system disorder, has continued to the present time. The left hand and arm disorders are upper motor neuron type, as is the continued inability of cerebral functioning such as inability to recognize objects and words. Prospects for recovery from this type of disease were very bleak by the time Mrs. Stich was transferred to Columbia Presbyterian. Mrs. Stich's condition is typical of the survivors of HSE; 28% of the HSE victims survive, of whom half manifest severe sequelae for life.

Mrs. Stich's age and gender tend to provide additional support for the HSE diagnosis. According to the research of the Collaborative Antiviral Study Group, the fact of being female makes it a little more likely that this encephalitis is HSE. An even stronger corelation to HSE exists from the fact that Mrs. Stich is over fifty years old; of people presenting with signs of focal encephalitis, among those over fifty years old, twice as many have HSE as non-HSE. Thus, Mrs. Stich, who was fifty-one years old at the time of onset, is twice as likely to be correctly diagnosed as having HSE than another form of encephalitis.

The absence of serological titer rise does not substantially affect the diagnosis of HSE. Several of the plaintiffs' medical experts attempted to cast doubt upon, or completely rule out, a diagnosis of HSE based upon the fact that the assays of Mrs. Stich's serum did not show the expected four-fold titer rise over time. Applying conventional wisdom, this absence of a four-fold titer rise was considered incompatible with HSE by Drs. Poser and Medinets. Of the plaintiffs' experts, only Dr. Lisak admitted that a lack of titer rise does not rule out HSE, although he, too, thought that the lack of a titer rise meant that it is not likely that this disease is HSE. Dr. Lisak noted, however, that he was unaware of the Collaborative Antiviral Study Group findings on this subject.

The Collaborative Study Group's recent research has, in fact, disclosed that the titers in confirmed HSE victims does not show a four-fold rise over time in fully one-half of such patients, when the testing for such a four-fold rise is conducted by the same methods as utilized in this case. The four methods of antibody assessments for HSE are: complement fixation, pressive hemagglutination, neutralizing antibodies, and immunofluorescence IgG antibodies. Here the antibody assessment was done by the complement fixation method, which has been found to be the least reliable of the available methods.

The purpose of antibody assessment is to determine the quantity of Herpes virus antibodies in an individual's serum or CSF. Various methods have their own sensitivity, which is the percentage of HSE patients who are correctly detected, and they each have their own specificity, which indicates the risk of obtaining false positive results on the test. The complement fixation method for measuring the quantity of Herpes Simplex virus antibodies is generally used because it is inexpensive and quick. The Collaborative Study Group has found, however, that, judged by the standards of sensitivity and specificity, the three other types of assays noted are greatly preferable to the complement fixation method. The Group has found that 60% of the assays of HSE patients by the neutralizing antibody method show a titer rise, and that 62% of the immunofluorescence and hemagglutination assay methods show a titer rise. The complement fixation method, on the other hand, which was the only method employed in this case, picks up a titer rise in only one-half of all actual HSE cases. Moreover, the complement fixation method produces more false positives, which are titer rises in patients who do not have HSE.

Thus, with an overall accuracy of only 50%, the Collaborative Research Group's recent research has cast serious doubt on the efficacy and usefulness of the complement fixation method. But even using the better titer methods, and monitoring the serologic response over a six-week period, Dr. Whitley testified that only 60% of Herpes Simplex Encephalitis cases show a response. Even if all three of the better test methods are performed on a given patient who actually has HSE, the chance that at least one of the test results will be positive for HSE is only 75%; this means that one-fourth of the patients having HSE would show no titer rise even if each of the three best assay methods were employed in their case.

In sum, the lack of a titer rise in this case is clearly overshadowed by the questionable efficacy of this particular test as well as the rest of the clinical, neurodiagnostic and CSF picture. These other factors, particularly the findings of pronounced focality in the CAT scans, EEG, and perhaps brain scans, prove that the plaintiff falls into the category of the one-half of HSE patients whose antibody titers fail to rise by the complement fixation method.

Moreover, other antibody assay evidence in this case is strongly indicative of HSE. It has been found by Herpes researchers that a reliable predictor of HSE is shown by taking the ratio of the antibodies in the CSF compared to the antibodies in the blood serum of the patient. When the ratio of CSF antibodies over serum antibodies is less than 1:20, the test is indicative of HSE. The normal ratio of these numbers is approximately 100. In this case, Mrs. Stich's serum at Columbia contained a one to thirty-two ratio of antibodies. At the same time, the CSF antibody ratio was one to two. Thus, the overall ratio of CSF antibodies to serum antibodies in this case is sixteen, which is less than twenty, and therefore indicative of HSE. Accordingly, the overall results of the serological tests in this case are consistent with a case of HSE in which the complement fixation titers failed to rise, an event occurring in one-half of all confirmed HSE patients.

Plaintiffs' final argument regarding HSE is that the failure to isolate the offending virus calls into question such a diagnosis. Attempts by Riverview and Columbia to isolate the offending virus from the CSF, blood serum, stool and urine were unsuccessful. Several of the plaintiffs' experts stated that the failure to isolate an active virus from these substances rules out the diagnosis of HSE. As other testimony revealed, that view was incorrect.

As Dr. Price testified, the Herpes Simplex virus is characteristically not isolated from the CSF, the blood, nor the stool of an HSE victim, such an event being "extraordinarily rare." The failure to isolate the offending virus in this case is characteristic of the clinical phenomenology of this disease; there simply is almost never an isolation of the Herpes Simplex virus in the various fluids (CSF, blood serum, stools) of a patient, even when the Herpes Simplex virus has been isolated in that patient's brain. And as Dr. Tsairis noted, failure to isolate the offending virus simply does not rule out a viral cause of Mrs. Stich's condition, according to current medical knowledge.

The physicians at Columbia Presbyterian Hospital had good reason not to perform a biopsy upon Mrs. Stich, even though they suspected that her problem was a viral encephalitis such as HSE. Mrs. Stich was transferred to Columbia Presbyterian Hospital for the purpose of a diagnosis on February 13, 1977, 79 days after her admission to Riverview Hospital. A biopsy at Columbia would probably have yielded no helpful information because it would have been extremely unlikely to find active Herpes Simplex virus after passage of that amount of time. This is so because, as Dr. Price testified, HSE is "a single phased disease where the virus causes infection, destruction of the [brain], and then, if the patient survives, the virus is cleared." Generally, a brain biopsy must be done as soon as possible to make a diagnosis for the effective use of antiviral drug therapy, with four weeks after onset regarded as the outside limit.

The Columbia physicians recognized that a biopsy twelve weeks after onset of the disease could have no implications for Mrs. Stich's treatment, because it was too late to institute. experimental drug therapy with ARA–A by that time in Mrs. Stich's disease process.

In summary, using the findings of the NIAID Collaborative Antiviral Study Group, which is recognized as the leading group of Herpes researchers in the world, I find strong factors in the present case predicting that HSE is the correct diagnosis, to the exclusion of any other type of encephalitis, at a high level of confidence. I must further conclude that if a brain biopsy had been done during the acute phase of Mrs. Stich's illness, and if the procedure were performed at the affected brain site, positive evidence of the Herpes Simplex virus would have been found and the diagnosis of Herpes Simplex Encephalitis would have been confirmed.

■ There is no dispute in this case that the cause of viral encephalitis is a virus, and that no virus was present in the swine influenza vaccine. There is likewise no dispute that Herpes Simplex Encephalitis is caused by the Herpes Simplex virus, and not by any sort of vaccination. Therefore, in the absence of any causal relationship between the administration of the swine flu inoculation and Mrs. Stich's condition, I must grant judgment to the defendant.

## MRS. STICH'S CONDITION IS NOT "ADEM" OR POST–VACCINAL ENCEPHALITIS

■ I find that the evidence in this case does not support either of plaintiffs' alternate diagnoses, acute disseminated encephalomyelitis ("ADEM") or post-vaccinal encephalitis.

ADEM is a diffuse disease of the white matter of the brain, often having the same clinical presentation · as post-vaccinal encephalitis. ADEM is a disorder or a group of disorders which is mediated on an immune or allergic basis. The neurodiagnostic findings and the focalized presentation and sequelae of symptoms in this case are consistent with a focal viral encephalitis, and not with the diffuse disease of ADEM. The distinction between focal and diffuse involvement in the CAT scans, EEGs and brain scans is not an absolute distinction for the clinical neurologist, because involvement may be focal or multi-focal and occur in many distinct areas of the brain, and yet not be diffuse because it does not occur all over throughout the brain. In this case, Mrs. Stich's involvement was at first focal, and then multi-focal as the viral encephalitis spread; the result was multi-focal involvement which eventually led to brain atrophy on a widespread basis.

The arguable presence of white matter involvement likewise does not distinguish this disease from Herpes Simplex Encephalitis, because the primary disease site was identified and reflected in gray matter disturbances, as discussed above. The eventual involvement of white matter was through edema which, as noted, was secondary to gray matter infection. Moreover, it must be recognized that HSE is a disease which affects both the gray and the white matter, while ADEM is a white matter disease. The presence of clear gray matter disturbances, as Dr. Poser has noted, argues strongly against ADEM.

The CAT scans in this case are not what one would expect in ADEM: the middle to higher cuts of the earlier CAT scans, which should be the site of ADEM, are normal and uninvolved. This lack of pathology in the higher cuts is evidence against ADEM. A donut-type lesion, which appeared in the February 17, 1977 CAT scan, affects the cortex of the brain (that is, the gray matter covering the brain), which is more consistent with HSE than ADEM. ADEM is not a cortical disease.

The plaintiffs have adduced no evidence to demonstrate that the CAT scans in this case are compatible with any series of known ADEM CAT scans. This disease, contrary to post-vaccinal encephalitis or ADEM, was highly localized; findings were consistently more pronounced on the left side of the body than the right. The even-

tual spread of the disease to involve opposite sides of the brain is the ordinary occurrence in HSE cases, where it is not unusual to have bilateral findings later in the illness.

ADEM is a very rare disease which has become even more rare. It is virtually unreported in the medical literature of CAT scans.

The physicians at Columbia, however, considered ADEM and were well aware of the parameters of that disease, but the consensus of the neurologists treating Mrs. Stich at Columbia was that her condition was not ADEM. ADEM or post-vaccinal encephalitis does not explain the profoundly focal characteristics, the devastating course of the disease and the neurodiagnostic findings in general. When compared with the strong support for viral encephalitis in general, and Herpes Simplex Encephalitis in particular, the support for ADEM and post-vaccinal encephalitis is insignificant.

Further, the history of vaccines fails to show a relationship between influenza vaccination and subsequent neurological disorders such as encephalomyelitis or encephalitis. Drs. Myer and Dyck testified that the overwhelming majority of scientists, neurologists, epidemiologists and other experts hold that there is no recognized or proven neurological complication of the use of influenza vaccinations other than GBS. Plaintiffs' evidence fails to establish the likelihood, as opposed to mere possibility, that the swine flu inoculation she received caused encephalitis. See *Jukubowski v. Minnesota Mining and Manufacturing*, 42 N.J. 177, 182, 199 A.2d 826 (1964).

The fact of a temporal association—that is, that an illness follows the vaccination in time—obviously does not mean that the immunization was the cause of the neurological illness. The temporal relationship between events is only the starting point, and not the finish line, for the epidemiological analysis which can best determine whether there is an association between the illness and the preceding vaccination. As Dr. Nathanson testified, the consensus of American epidemiologists does not associate any disease other than GBS with the swine flu vaccine.[26]

## CONCLUSION

In light of my finding that Mrs. Stich's present condition is in all probability due to HSE, I think it is appropriate to note that I was quite impressed with the quality of testimony offered by Drs. Price, Whitley, Tsairis and Goodgold. Individually and collectively they offered a plausible and credible causal and diagnostic thesis which I have accepted. The records of The Neurological Institute of the Columbia Presbyterian Hospital described this as a "puzzling case". It is indeed. However, as one vested with the responsibility of adjudicating the case, I cannot take the luxury of adopting this description and walking out, so to speak. My obvious responsibility has been to consider all of the evidence in this case and to apply the law governing the case to the facts as I find them to be. Having done that, I am constrained to conclude that plaintiffs have failed to establish by a preponderance of the credible evidence that Mrs. Stich's condition is Guillian-Barre Syndrome. I further find that plaintiffs have also failed to demonstrate that the swine flu inoculation which was administered to Mrs. Stich was a substantial factor in causing Mrs. Stich's illness. I have instead concluded that Mrs. Stich's condition is, to a reasonable medical and legal certainty and by a preponderance of the credible evidence, Herpes Simplex Encephalitis of a

**26.** In the medical literature, there are no reports that provide evidence associating non-GBS neurological diseases with the vaccine other than a single anecdotal report. The only epidemiological study conducted to determine the relationship between the swine flu vaccine and illnesses other than GBS was done by Dr. Henry Retailliau and Dr. Michael Hattwick and their associates at the Center for Disease Control. Their post swine flu surveillance did not support the hypothesis that encephalitis was related to the vaccine. No vaccine-associated encephalitis was found, despite the fact that the Retailliau-Hattwick Surveillance system had specifically sought reports of encephalitis.

viral etiology unrelated to the swine flu inoculation.

An order in conformance with my determination has been entered by the court.